# IN THE COURT OF APPEALS OF IOWA

No. 13-1797
Filed November 26, 2014

**WILLIAM JOHN FLINN,**
    Plaintiff,

**vs.**

**IOWA DISTRICT COURT**
**FOR POLK COUNTY,**
    Defendant.

_____

Certiorari to the Iowa District Court for Polk County, Rebecca Goodgame

Ebinger, Judge.


William Flinn challenges the district court's finding he was in contempt of

the dissolution decree. **WRIT SUSTAINED IN PART, ANNULLED IN PART.**



Catherine C. Dietz-Kilen of Harrison & Dietz-Kilen, P.L.C., Des Moines, for

plaintiff.

Elizabeth Kellner-Nelson of Kellner-Nelson Law Firm, P.C., for defendant.



Heard by Danilson, C.J., and Doyle and Tabor, JJ.

**DANILSON, C.J.**

The district court found William Flinn in contempt for refusing to provide his former spouse with the names of individuals providing care to their child while he was at work, and for failing to "foster feelings of affection and respect between the child[] and the other party." Flinn contends the court's findings are not supported by the evidence. We uphold the contempt finding in the first respect because it is clear that William's former spouse, Michaelle Flinn, was entitled to know the specific identity of the person providing care for the child. And while we agree that former spouses should encourage respect between the other parent and child, that laudatory goal cannot support a finding of contempt in the circumstances presented here.[1]

**I. Background Facts and Proceedings.**

The marriage of William Flinn and Michaelle Flinn was dissolved by decree on April 25, 2013. In the dissolution decree, the district court "observed during the trial that [William] is still very angry with [Michaelle] over how their marriage and relationship broke up and appears to be very rigid in regard to certain matters including following only Court orders regarding visitation with [the child] with little or no variation or communication." The decree ordered joint legal custody of their five-year-old daughter, A.F., with Michaelle having physical care. William was to have weekly visitation with the child Tuesday at 4:15 p.m. to Thursday at 7:45 p.m., alternating weekends beginning at 4:15 on Friday until 7 p.m. on Sunday, and holidays as set forth in the decree.

---

[1] Although the district court found William guilty of contempt for failing to foster feelings of affection, the court imposed no sanction because the court determined that Michaelle had similarly failed to comply with these terms of the decree.

William was to have visitation with A.F. over the 2013 Memorial Day weekend beginning at 4:15 p.m., Friday, May 24, and ending Monday, May 27, at 7 p.m. Michaelle was aware that William worked as a detention officer at the Polk County Jail each week Friday through Tuesday from 7:30 a.m. to 4:00 p.m. Michaelle thus understood William would be working each day of the Memorial Day weekend from 7:30 a.m. to 4 p.m. She asked that William provide her with the names and contact information of the person or persons who would be caring for their child while he worked. Despite numerous requests, William's only eventual response was "my family." William arrived to pick the child up at 4:15 on Friday, but Michaelle and the child were not there. Text messages were exchanged, but William did not inform Michaelle who would be caring for their child. William was not able to visit with his child until Monday at 4:15 p.m. He returned the child at 7 p.m. that day.

On May 29, William filed an application to show cause, complaining he had been denied visitation. He asserted Michaelle refused to follow the visitation schedule. He asserted:

> 12. [William's] three (3) sisters, brother, mother, father and grandmother all live in close proximity to [William].
> 13. [William] made plans with his family members to provide care for A.K.F. during the holiday weekend at the times when he was required to work.
> 14. [William] arrived at [Michaelle's] home on Friday, May 24, 2013, [William's] birthday, at 4:15 p.m. to pick the minor child up. [Michaelle] and minor child were not home, and [Michaelle] refused to provide the minor child to [William].
> 15. After letting [Michaelle] know [William] would be again attempting to pick the minor child up on Saturday, May 25, 2013 at 4:15 p.m., [Michaelle] and minor child were again not home when [William] went to exercise his awarded visitation.
> 16. [Michaelle] continued to deny [William] his awarded visitation with the minor child on Sunday, May 26, 2013 when

[William] again attempted to pick the minor child up at [Michaelle's] residence at 4:15 p.m.

17. [William] was finally allowed to exercise his parenting time with the minor child on Monday, May 27, 2013 when he picked the minor child up from [Michaelle's] residence at 4:15 p.m. Because his scheduled visitation ended at 7:00 p.m. on the same day, the 3-day weekend visitation [William] was awarded was reduced to less than 3-hours in length due to [Michaelle's] actions.

18. [Michaelle's] behavior is willful and wanton and in disregard of the Order of the Court, the rights of [William] and the best interest of the minor child.

On June 18, William arrived at Michaelle's home to pick up the child for a ten-day visit.[2] A.F. was holding on to Michaelle's leg and crying when William arrived. Michaelle asked, "Will she be able to call if she wants to?" William did not respond to Michaelle. Michaelle asked two more times if she would be able to call or talk to the child during the visit. William stated, "It's supposed to be uninterrupted, Michaelle." Michaelle stated, "Okay. I tried baby, I really tried." He and A.F. got in William's car. Michaelle then said, "That's really nice that you do that to her."

On June 25, Michaelle filed an application for rule to show cause against William. In the first count, Michaelle contended William "has repeatedly and consistently refused to provide [her] with any information regarding who is caring for the minor child during his visitation despite repeated request." In a second count, Michaelle alleged that William's behaviors on June 18 "were disrespectful, demeaning, and did not foster feelings of affection between the child" and her. Michaelle also contended that William did not foster feelings of affection by preventing her from being able to telephone the child during visits.

---

[2] As he did with most transfers of the child, William made an audio recording of this transaction with his cell phone. He submitted a transcript of the transaction with his response to Michaelle's application to show cause.

A hearing was held on the dueling applications. Michaelle acknowledged she refused to allow the Memorial Day visitation, but argued she was not given information on who would care for the child. William testified he had refused to provide Michaelle the information she requested. He stated, "I told her my family would be watching her." He acknowledged the June 18 exchange, but provided records from his phone indicating the child and mother did speak on at least two occasions during that extended visitation time.

The district court found both parties in contempt. With respect to Michaelle's application, the court ruled:

> 9. As to Count one of [Michaelle's] application for rule to show cause, the Court finds beyond a reasonable doubt that [William] violated the court's order by knowingly and willfully refusing to provide [Michaelle] with the names of individuals providing childcare for the parties' minor child during [William's] visitation.
> 10. As Count two of [Michaelle's] application for rule to show cause, the Court finds beyond a reasonable doubt that [William] violated the court's order by knowingly and willfully failing to foster feelings of affection between the minor child and [Michaelle]. However, it is clear from the evidence presented that [Michaelle] has also acted in ways which are inconsistent with fostering feeling of affection between the minor child and [William] and therefore, no sanction will be imposed upon [William].

The district court sentenced each party to thirty days in jail but withheld mittimus, allowing each to purge the contempt if there were no further violations for a period of six months. Each party filed a motion to reconsider. Those motions were denied.

William challenges the court's findings that he was in contempt.[3]

---

[3] Michaelle has not challenged the court's ruling as it relates to her, and we therefore do not address the findings of contempt against Michaelle.

**II. Scope and Standards of Review.**

We review certiorari actions for correction of errors at law. *Taft v. Iowa Dist. Ct.*, 828 N.W.2d 309, 312 (Iowa 2013). We "examine only the jurisdiction of the district court and the legality of its actions." *Christensen v. Iowa Dist. Ct.*, 578 N.W.2d 675, 678 (Iowa 1998). An illegality exists "[w]hen the court's findings of fact are not supported by substantial evidence, or when the court has not applied the law properly." *Ary v. Iowa Dist. Ct.*, 735 N.W.2d 621, 624 (Iowa 2007).

A person who willfully disobeys a court order may be cited and punished for contempt. Iowa Code § 598.23(1) (2013). A contempt proceeding is essentially criminal in nature, and each element must have been established beyond a reasonable doubt. *In re Marriage of Ruden*, 509 N.W.2d 494, 496 (Iowa Ct. App. 1993).

**III. Merits.**

Only willful disobedience of a court order will justify a conviction for contempt. *Id.* To find willful disobedience "'requires evidence of conduct that is intentional and deliberate with a bad or evil purpose, or wanton and in disregard of the rights of others, or contrary to a known duty, or unauthorized, coupled with an unconcern whether the contemner had the right or not.'" *Ary*, 735 N.W.2d at 624 (quoting *Lutz* v. *Darbyshire*, 297 N.W.2d 349, 353 (Iowa 1980), *overruled on other grounds by Phillips v. Iowa Dist. Ct.*, 380 N.W.2d 706, 707, 709 (Iowa 1986)). "A failure to follow a court order is not willful if a contemner shows the order was indefinite or that the contemner was unable to comply with the order." *Id.* at 625; *see Christensen*, 578 N.W.2d at 678.

The district court found William willfully disobeyed two provisions of the decree concerning joint legal custody, specifically:

> For the purposes of this decree, joint legal custody shall be defined as follows:
> (a) Both parents shall have legal access to information concerning the child, including but not limited to medical, educational, childcare and law enforcement records.
> . . . .
> (h) Each of the parties shall act to foster feelings of affection and respect between the child[] and the other party, and neither party will do anything which may estrange the child from the other party or impair the child's high regard for the other party.

***A. Access to information.*** The court found William's refusal to provide the names of those who would be caring for the child violated the decree's command that each parent "shall have legal access to information concerning . . . childcare." William argues that in eventually stating "his family" would be caring for the child, "he provided the identify of persons historically responsible for child care, whose identities would be well-known to Michaelle." He argues he was not "concealing an unknown childcare provider" or "attempting deception." He finds it significant that he at first "remained silent," which he claims shows he was not evincing belligerence or evil intent.

Having reviewed the testimony presented at the hearing, we conclude the district court did not err in finding beyond a reasonable doubt that William willfully refused to provide information concerning who would be providing care to the parties' daughter while he was working. William admitted he had not provided the names and phone numbers of persons taking care of the child when Michaelle asked for that information. William testified he believed babysitting is

different than childcare, and he was not required to provide a babysitter's name.

William testified:

> Q. You—is it your testimony that you do not believe that Michaelle has a right to know who is caring for [A.F.] while you are at work? A. I would say that I leave her alone to do—because she's the responsible adult in charge. She is—she is the mother of [A.F.]. I am the father of [A.F.]. And I believe that we are both capable of doing what's in [A.F.]'s best interest while—you know, if someone is at work or someone has—you know, she was in an internship. I'm sure she had a babysitter in there somewhere that I don't know about, but that's okay.
>
> Q. Do you believe when Michaelle asks you, specifically asks you who is providing childcare, that you have a responsibility or a duty to tell her who that person is? A. I would say only if it's reciprocated.
>
> Q. Have—you agree there have been numerous times where she has specifically asked you who is providing childcare for [A.F.]? A. Yes.
>
> Q. And you agree that you, each time, have failed to provide her the name of that person? A. I provided her that it was my family.
>
> Q. You've had a number of individuals living in your home. Would you agree that Michaelle has asked you who's living in the home? A. Yes, she has.
>
> Q. And you've refused to provide that information? A. Correct.
>
> Q. Again, do you believe that Michaelle is entitled to know if there is another individual living in a home where her child is also living? A. I don't. I don't agree with that. It's my home and I can—I think I'm capable of, you know, picking—knowing these people and who I'm having around my child, and I can be responsible for all of it.
>
> Q. You have had individuals who have been residing in your home also caring for [A.F.]; correct? A. Yes, I had Laurie babysit [A.F.] when I was at work. Kerry has babysat. Sharon has babysat. My dad has babysat. My grandmother has babysat. My brother even babysat.
>
> Q. You also left [A.F.] in the care of an individual named Shelly? A. No, she has not babysat.

William's stance is unreasonable. A parent with joint legal custody is entitled to know who is caring for their child and should not be required to guess who that person might be or how to contact that person in the event the need

arises. The child is of young age and that circumstance is different than an older child with whom the other parent may be able to communicate with by cell phone. William's failure to provide the names of the caregivers was "in disregard of the rights of others [Michaelle], or contrary to a known duty, or unauthorized, coupled with an unconcern whether the contemner had the right or not." *Lutz*, 297 N.W.2d at 353. The record provides substantial evidence for a rational trier of fact to find William willfully refused to provide Michaelle with the name of the person who would provide care for the child while William was working. We agree the better practice would be to specifically address in the decree each parent's right to the name and contact information while the child was in another's person's care. Nevertheless, we conclude the decree's language that each parent "is entitled to legal access to information" concerning "childcare" is not ambiguous and sufficiently conveys the requirement to provide the information sought.

**B. Fostering feelings of affections.** As to the contempt finding based on the June 18 exchange, William was asked and responded to the following questions:

> Q. On June 18th when you came to pick up [A.F.], we've all heard the recording, we've seen the transcript. You agree that when Michaelle's trying to speak with you about [A.F.] calling, initially you ignore any—you ignore Michaelle completely? Is that accurate? A. Yes. I had no intention of trying to speak with her about what had went on with not being able to get [A.F.] and all of that, so I did not want to engage her in front of [A.F.].
> Q. And isn't it true that that's typically how you treat Michaelle during visitation exchanges? You refuse to respond to questions, refuse to speak to her? A. Well, most of the time she doesn't ever ask me any questions.
> Q. Do you agree that's upsetting for [A.F.]? A. What happened on the 18th, I believe, would probably upset her, yes.

Q. Do you believe that not responding when [A.F.]'s mother is asking you a question is disrespectful? A. I don't know that I'd call it disrespectful. I was just trying not to make it worse than it already was.

. . . .

Q. Do you feel you are modeling good behavior? A. I think in the—in—I mean, what had happened, I just felt like it was not the time and place to try to figure this out in front of [A.F.], being as, you know, she's upset anyway. Obviously, Michaelle is not happy. I'm not happy. It was just the wrong time and place for all of that to happen.

Q. When [A.F.] was picked up for this June visit, she was going to be gone for a week to ten days; is that—actually, ten days; is that right? A. Yes.

Q. Generally, when she has visits, those are for two days, maybe three? Would that be accurate? A. Well, I mean, they—the Court knows my visitation schedule, so she'd get—if you're just counting nights, most of the time I get two nights at a time, you know, and every other weekend for two nights.

Q. So prior to this summer, [A.F.] had not been away from her mother for more than two to three days at a time. Would you agree with that? A. Yes.

Q. That is a pretty big thing for a five-year-old, don't you think? A. Yes, I would agree.

REDIRECT EXAMINATION BY MS. DIETZ-KILEN:

Q. On June 18th when you came to pick up [A.F.], was she upset by the conversation, or was she upset before you even got there? A. She was upset before when she came out of the door. She was in Michaelle's arms and she was already upset. I don't know. I can't make speculation, I guess.

Q. And if you had engaged in conversation with Michaelle, would that have improved the situation? A. I don't believe so.

William challenges the court's finding of contempt, arguing the record shows a father who is doing his best to prevent his child from being caught in the middle of an argument, not willful and knowing behavior designed to affect the feelings of affection of the parties' child.

As already noted, willful disobedience means "conduct that is intentional and deliberate with a bad or evil purpose, or wanton and in disregard of the rights of others, or contrary to a known duty, or unauthorized, coupled with an

unconcern whether the contemner had the right or not." *Christensen*, 578 N.W.2d at 678. An alleged contemner may show his or her failure to comply was not willful by showing the order was indefinite. *Id.*

The court's finding of contempt was based upon the decree language that each parent was to "foster feelings of affection and respect between the child[] and the other party." The court's ruling relied upon the failure to provide access by telephone. At the end of the contempt hearing, the court stated on the record:

> The Court does find that it has been proved beyond a reasonable doubt that this also was a violation of the order and is contemptuous. The plain reading of [the transcript of the exchange] in and of itself demonstrates that this was a violation. But the audio recording is particularly troubling, the context of the conversation and the context of this being an initial visit. The reference to "uninterrupted time" by [William], that is not what visitation is on either side. *Both of you have the obligation to allow reasonable access via telephone calls to the other party while they are visiting, particularly over a stretch of time that is seven to ten days.*
> *The decree in this instance did not put that in, that particular requirement.* Most of my orders I say, you know, Must provide reasonable access to the other person via telephone or Skype or other means during visitations. That doesn't mean that the violation didn't occur in this instance because it did infringe upon that general requirement to foster feelings of affection.
> So the Court finds there was a contempt here. But the Court finds that no action is required for that finding of contempt, particularly in light of the fact that the Court believes that the—while it wasn't charged as a contempt against [Michaelle], [Michaelle] has also acted in ways that are inconsistent with fostering affection.

(Emphasis added.)

The district court gave sage advice to assist Michaelle and William in their efforts to jointly parent their child. We agree the term "uninterrupted time" does not denote the caretaker may deny the child's communication with the other parent. Rather it simply means that the same parent shall provide the child's

care throughout the designated time period so the caretaker can plan a vacation or other activities.

The district court also recognized that the decree did not explicitly state that the parties were to provide the other parent reasonable access to call the child during visitation. We agree. We conclude the decree "was indefinite," *see Christensen*, 578 N.W.2d at 678, in respect to allowing telephone access and cannot be the basis for the finding of a contempt as alleged, that is, that William failed to foster feelings of affection and respect between the mother and child. The concern intended to be addressed by the phrase "foster feelings of affection and respect" is the child's feelings of affection and respect for the other parent. Notwithstanding, both parties are strongly encouraged to co-parent their child by allowing reasonable telephone contact.

Here, Michaelle was able to communicate in a limited fashion with the child in two brief phone calls during the ten-day period. Reasonable telephone contact with the child is in the best interests of the child, and failure to allow reasonable contact unless prohibited by the decree may be a factor in any modification action related to custody or visitation terms.

Michaelle also argued that during the exchange of the child prior to William's ten-day uninterrupted visitation, William's behavior was disrespectful and demeaning. Because the child was present, Michaelle argues his conduct was contrary to the "foster feelings of affection and respect" provision. We have listened to the audio recording of the exchange, and although the child was crying during the exchange, William did not raise his voice. He explained his understanding of "uninterrupted time," and was unwilling to carry on a long

conversation with Michaelle. We conclude William's comments were not contemptuous.

**IV. Conclusion.**

The dissolution decree's language that each parent "is entitled to legal access to information" concerning "childcare" is not ambiguous. The district court did not err in finding beyond a reasonable doubt that William willfully refused to provide information to Michaelle concerning who would be providing care to the parties' daughter while he was working. We annul the writ with respect to the finding of contempt on count one.

However, with respect to the contempt finding related to William's failure to "foster feelings of affection and respect" provision, we conclude William's comments were not contemptuous. We thus sustain the writ and vacate the finding of contempt on count two.

**WRIT SUSTAINED IN PART, ANNULLED IN PART.**